THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

Jonathan Moore
and Brad Truitt

    Plaintiffs,

v.

Charles Carroll
  and Integrated Biometric Technology

    Defendants.

Case No.:

Honorable Judge
Magistrate Judge

## COMPLAINT

Plaintiffs Jonathan Moore and Brad Truitt ("Plaintiffs") file this lawsuit against (1) Charles Carroll and (2) Integrated Biometric Technology ("Defendants" or "IBT") for violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §201, *et seq.*

For Defendants' violation of the FLSA's minimum wage and overtime compensation, Plaintiffs seek the recovery of unpaid wages, overtime compensation, unlawful kickbacks/deductions plus an equal amount as liquidated damages, as well as an award of reasonable attorney's fees, costs, and expenses of litigation. Plaintiffs seek an award of pre- and post- judgment interest, and lump sum for increased tax liability related to any award payment.

**I.**     **JURISDICTION**

1. This court has jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 216(b).

2. Venue is proper under 28 U.S.C. § 1391.

**III.**     **PARTIES**

3. Defendant Charles Carroll ("Carroll") is a resident of Williamson County, and his current address is unknown.

4. Defendant Integrated Biometric Technologies ("IBT") was a Delaware company registered with the Tennessee Secretary of State until April 4, 2023, when its status was revoked for not having a registered agent.

5. IBT still has an active website that can be accessed at www.ibt2.com.

6. Carroll was the CEO and founder of IBT.

7. Plaintiff Jonathan Moore ("Moore") is a citizen and resident of Tennessee, residing in Williamson County.

8. Plaintiff Brad Truitt ("Truitt") is a citizen and resident of Tennessee, residing in Rutherford County.

9. Moore and Truitt ("Plaintiffs") submit their written consent pursuant to 29 U.S.C. § 216(b). [**Attachment 1 and Attachment 2**].

IV. FACTUAL ALLEGATIONS

    A. IBT'S ORGANIZATIONAL STRUCTURE

10. Carroll founded IBT in or around 2001.

11. Carroll re-acquired the rights to IBT in or around November of 2020.

12. In 2021 Carroll was IBT's CEO.

13. In 2021 Claudia Azevedo ("Azevedo") was IBT's Executive Vice President and Chief Financial Officer.

14. In 2021 Carroll and Azevedo hired new IBT employees.

15. On December 31, 2021, IBT acquired Tailored Solutions Corp. ("TSC") for an undisclosed amount.

### B. IBT'S OPERATIONS AND SYSTEM

16. IBT was a biometric service provider that specialized in projects with municipalities and other government entities.

17. IBT worked to provide technology services and provide applications for fingerprint-based checks to be sold nationwide.

18. IBT operated with approximately 14 employees.

19. IBT operated with traditional corporate system with C-level executives, VP level executives, and managers.

20. Upon information and belief, all of IBT's employees were salaried.

21. IBT offered a bonus plan to its employees.

22. IBT included a severance provision in employee contracts.

23. IBT offered its employees to purchase Class B stock in the company.

24. IBT represented there were 43,725 Class B Non-voting units which it offered to employees at $50.00 per unit with a minimum purchase amount of $10,000.00.

25. The stock units were not registered with the Securities Exchange Commission or any other state or local body.

### PLAINTIFF MOORE'S TENURE WITH DEFENDANT

26. In a letter dated May 14, 2021, IBT offered Moore the position of Executive Vice President ("IBT Moore Offer Letter").

27. The IBT Moore Offer Letter was signed by Avzevedo on behalf of Carroll.

28. On May 18, 2021, Moore signed the IBT Moore Offer Letter.

29. Moore's job duties included overseeing state, federal, and commercial Request for Information and Request for Proposal processes.

30. Moore's job duties also included helping in the management of merger and acquisitions.

31. Moore also supported sales teams on site in West Virginia in meetings with a law enforcement agency.

32. Moore traveled to Dallas, Texas to meet with a call center associated with the service bid.

33. Moore was part of a team that submitted bids for biometric background check services to government entities such as Texas DPS, West Virginia State Police, and South Carolina state law enforcement division.

34. Moore renegotiated pricing services for Tailored Solutions Corp., a middle layer software supplier and subsidiary of IBT, with an international customer providing services to multiple US states.

35. Moore accepted IBT's compensation offer that included a biweekly salary of $6,923.08, less applicable deductions (US $180,000 if annualized).

36. Moore worked more than 50 hours per week on average.

37. IBT classified Moore as exempt under federal and state wage and hour laws.

38. Moore's first official day of work was June 14, 2021.

39. On June 25, 2021, IBT paid Moore a gross amount of $6,923.08.

40. On July 9, 2021, IBT paid Moore a gross amount of $6,923.08.

41. On July 23, 2021, IBT paid Moore a gross amount of $6,923.08.

42. On August 6, 2021, IBT paid Moore a gross amount of $6,923.08.

43. On August 20, 2021, IBT paid Moore a gross amount of $6,923.08.

44. On September 3, 2021, IBT paid Moore a gross amount of $6,923.08.

45. On September 17, 2021, IBT paid Moore a gross amount of $6,923.08.

46. On October 1, 2021, IBT paid Moore a gross amount of $6,923.08.

47. On October 15, 2021, IBT paid Moore a gross amount of $6,923.08.

48. On October 29, 2021, IBT paid Moore a gross amount of $6,923.08.

49. On November 12, 2021, IBT paid Moore a gross amount of $6,923.08.

50. On November 26, 2021, IBT paid Moore a gross amount of $6,923.08.

51. On December 10, 2021, IBT paid Moore a gross amount of $6,923.08.

### Late Payment of Salary

52. On December 24, 2021, IBT did not pay Moore a gross amount of $6,923.08.

53. On December 24, 2021, IBT did not pay Moore any money as wages.

54. On December 31, 2021, IBT paid Moore the biweekly amount that was due on December 24, 2021.

### Nonpayment of Salary

55. On January 7, 2022, IBT did not pay Moore a gross amount of $6,923.08.

56. On January 7, 2022, IBT did not pay Moore any money as wages.

57. On January 21, 2022, IBT did not pay Moore a gross amount of $6,923.08.

58. On January 21, 2022, IBT did not pay Moore any money as wages.

59. On February 4, 2022, IBT did not pay Moore a gross amount of $6,923.08.

60. On February 4, 2022, IBT did not pay Moore any money as wages.

61. On February 18, 2022, IBT did not pay Moore a gross amount of $6,923.08.

62. On February 18, 2022, IBT did not pay Moore any money as wages.

63. On March 18, 2022, IBT did not pay Moore a gross amount of $6,923.08.

64. On March 18, 2022, IBT did not pay Moore any money as wages.

65. On April 1, 2022, IBT did not pay Moore a gross amount of $6,923.08.

66. On April 1, 2022, IBT did not pay Moore any money as wages.

67. On April 15, 2022, IBT did not pay Moore a gross amount of $6,923.08.

68. On April 15, 2022, IBT did not pay Moore any money as wages.

69. On or around April 15, 2022, employees threatened a walk-out if they were not paid.

70. IBT responded by showing the employees that a payroll was being processed.

71. IBT informed employees that an investment was received which would ensure no further interruptions in pay.

72. On April 19, 2022, IBT paid Moore a gross amount of $6,923.08 purportedly representing the biweekly pay that was due January 7, 2021.

73. On May 6, 2022, IBT represented in an e-mail that a "wire issue" had occurred and that payroll could not be processed in full.

74. On May 6, 2022, IBT offered to pay Moore a direct payment of the net pay for one payroll period without any taxes withheld, promising to pay the taxes before the year ended.

75. Moore declined that amount and instead asked for reimbursement of his outstanding expenses in the amount of $2,262.00, which IBT paid.

76. On April 28, 2022, IBT did not pay Moore a gross amount of $6,923.08.

77. On April 28, 2022, IBT did not pay Moore any money as wages.

78. On May 13, 2022, IBT did not pay Moore a gross amount of $6,923.08.

79. On April 28, 2022, IBT did not pay Moore any money as wages.

80. On May 13, 2022, Moore and the other employees cleaned out their offices, returned all equipment, and informed IBT that they would no longer be working until they received their paychecks.

81. On May 20, 2022, Moore received a letter from IBT wherein IBT claimed to accept his "verbal resignation" and stated, "As we work diligently to reorganize, please know that it is our intention to settle all outstanding wages and any outstanding expenses as quickly as possible."

82. On May 27, 2022, IBT did not pay Moore a gross amount of $6,923.08.

83. On May 27, 2022, IBT did not pay Moore any money.

84. Defendants have not paid Moore any of the unpaid salary amounts in paragraphs 55 through 83.

## Investment

85. On October 4, 2021, Carroll encouraged employees to participate in the IBT investment plan.

86. Moore personally invested $10,000.00 into the IBT investment plan.

87. IBT did not return Moore's $10,000.00 investment.

88. Moore is still owed an accounting or refund of the $10,000.00 investment Carroll encouraged him to make in IBT.

## Bonus Pay

89. IBT, in their Offer Letter, guaranteed Moore a Bonus to be paid on or around March 15 of each year, based on his salary.

90. IBT never infomed Moore that he was not eligible for a bonus.

91. IBT did not pay out bonuses on March 15, 2022, or any day.

92. Moore is owed $23,625.00 in unpaid pro-rated bonus pay.

### Severance

93. IBT, in their Offer Letter to Moore, stated that in the event that Moore terminated his employment for "Good Reason," as defined therein, he would be eligible for a severance up to 3 months of his current salary.

94. Moore is still owed $45,000.00 in unpaid severance pay.

### PLAINTIFF TRUITT'S TENURE WITH DEFENDANT

95. In a letter dated February 16, 2021, IBT offered Truitt the position of Vice President of Biometric Enrollment and Applicant programs ("IBT Truitt Offer Letter").

96. Truitt signed the offer and returned it on or about February 16, 2021.

97. The IBT Truitt Offer Letter was signed by Azevedo on behalf of Carroll.

98. On April 26, 2021, Truitt began working for IBT.

99. Truitt's job duties included operating biometric scanning software programs.

100. Truitt worked with the sales teams to demonstrate software capabilities and provide credibility for customers in Texas, West Virginia, and South Carolina.

101. Truitt worked with sales teams pursuing clients in Montana, Alabama, and New Mexico.

102. Truitt accepted IBT's compensation offer that included a biweekly salary of $6,153.84, less applicable deductions (US $160,000 if annualized).

103. IBT classified Truitt as exempt under federal and state wage and hour laws.

104. Truitt worked more than 50 hours per week on average.

105. On April 30, 2021, IBT paid Truitt a gross amount of $6,153.84.

106. On May 14, 2021, IBT paid Truitt a gross amount of $6,153.84.

107. On May 28, 2021, IBT paid Truitt a gross amount of $6,153.84.

108. On June 11, 2021, IBT paid Truitt a gross amount of $6,153.84.

109. On June 25, 2021, IBT paid Truitt a gross amount of $6,153.84.

110. On July 9, 2021, IBT paid Truitt a gross amount of $6,153.84.

111. On July 23, 2021, IBT paid Truitt a gross amount of $6,153.84.

112. On August 6, 2021, IBT paid Truitt a gross amount of $6,153.84.

113. On August 20, 2021, IBT paid Truitt a gross amount of $6,153.84.

114. On September 3, 2021, IBT paid Truitt a gross amount of $6,153.84.

115. On September 17, 2021, IBT paid Truitt a gross amount of $6,153.84.

116. On October 1, 2021, IBT paid Truitt a gross amount of $6,153.84.

117. On October 15, 2021, IBT paid Truitt a gross amount of $6,153.84.

118. On October 29, 2021, IBT paid Truitt a gross amount of $6,153.84.

119. On November 12, 2021, IBT paid Truitt a gross amount of $6,153.84.

120. On November 26, 2021, IBT paid Truitt a gross amount of $6,153.84.

121. On December 10, 2021, IBT paid Truitt a gross amount of $6,153.84.

**Late Payment of Salary**

122. On December 24, 2021, IBT did not pay Truitt a gross amount of $6,153.84.

123. On December 31, 2021, IBT paid Truitt the biweekly amount that was due on December 24, 2021.

**Nonpayment of Salary**

124. On January 7, 2022, IBT did not pay Truitt a gross amount of $6,153.84.

125. On January 7, 2022, IBT did not pay Truitt any money as wages.

126. On January 21, 2022, IBT did not pay Truitt a gross amount of $6,153.84.

127. On January 21, 2022, IBT did not pay Truitt any money as wages.

128. On February 4, 2022, IBT did not pay Truitt a gross amount of $6,153.84.

129. On February 4, 2022, IBT did not pay Truitt any money as wages.

130. On February 18, 2022, IBT did not pay Truitt a gross amount of $6,153.84.

131. On February 18, 2022, IBT did not pay Truitt any money as wages.

132. On March 18, 2022, IBT did not pay Truitt a gross amount of $6,153.84.

133. On March 18, 2022, IBT did not pay Truitt any money as wages.

134. On April 1, 2022, IBT did not pay Truitt a gross amount of $6,153.84.

135. On April 1, 2022, IBT did not pay Truitt any money as wages.

136. On April 15, 2022, IBT did not pay Truitt a gross amount of $6,153.84.

137. On April 15, 2022, IBT did not pay Truitt any money as wages.

138. On or around April 15, 2022, employees threatened a walk-out if they are not paid.

139. IBT responded by showing the employees that a payroll was being processed.

140. IBT informed employees that an investment was received which would ensure no further interruptions in pay.

141. On April 19, 2022, IBT paid Truitt a gross amount of $6,153.84 purportedly representing the biweekly pay that was due January 7, 2021.

142. On April 28, 2022, IBT did not pay Truitt a gross amount of $6,153.84.

143. On April 28, 2022, IBT did not pay Truitt any money as wages.

144. On May 6, 2022, IBT represented in an e-mail that a "wire issue" has occurred and that payroll could not be processed in full.

145. On May 13, 2022, IBT did not pay Truitt a gross amount of $6,153.84.

146. On May 13, 2022, IBT did not pay Truitt any money as wages.

147. On May 13, 2022, Truitt and the other employees cleaned out their offices, returned all equipment, and informed IBT that they would no longer be working until they received their paychecks.

148. On May 20, 2022, Truitt received a letter from IBT wherein IBT claimed to accept his "verbal resignation" and stated, "As we work diligently to reorganize, please know that it is our intention to settle all outstanding wages and any outstanding expenses as quickly as possible."

149. On May 27, 2022, IBT did not pay Truitt a gross amount of $6,923.08.

150. On May 27, 2022, IBT did not pay Moore any money as wages.

151. Defendants have not paid Truitt any of the unpaid salary amounts in paragraphs 123 through 151.

### Unreimbursed Business Expense Payments

152. Truitt had two outstanding expense reports that were approved for over $1,000 in credit but were not paid.

### Severance

153. IBT, in their Offer Letter to Truitt, stated that in the event that Truitt terminated his employment for "Good Reason," as defined therein, he would be eligible for a severance up to 3 months of his current salary.

154. Per the agreement, Truitt is owed $36,923.04 in severance.

### Investment

155. On October 4, 2021, IBT encouraged employees to participate in the IBT investment plan.

156. Truitt personally invested $10,000.00 into the IBT investment plan.

157. IBT did not return or provide any accounting of Truitt's $10,000.00 investment.

## V. CAUSES OF ACTION

### FLSA Allegations

158. At all times material to this action, Defendants were an enterprise whose annual gross volume of sales made or business done was not less than $500,000 (exclusive of excise taxes at the retail level that are separately stated).

159. At all times material to this action, Defendants were an enterprise engaged in commerce or in the production of goods for commerce as defined §203(s)(1) of the FLSA.

160. At all times material to this action, Moore assisted with and performed work in multiple states.

161. At all times material to this action, Truitt assisted with and performed work in multiple states.

162. Defendant Carroll acted directly and indirectly in the interest of IBT in relation to Moore and Truitt.

163. Defendant Carroll acted in the capacity of Chief Executive Officer.

164. Defendant Carroll had operational control over IBT.

165. Defendant Carroll is jointly and severally liable under the FLSA for unpaid wages.

166. Defendant Carroll directly recruited Truitt.

167. Defendant Carroll directly supervised Truitt.

168. Defendant Carroll directly recruited Moore.

169. Defendant Carroll directly supervised Moore.

170. Defendant Carroll communicated and/or ratified communications to IBT employees regarding IBT pay practices.

171. Defendant Carroll communicated and/or ratified communications to IBT employees regarding late payments and additional compensation.

172. Defendant Carroll communicated and/or ratified communications to IBT employees regarding short-term and long-term disability, Life, and AD&D insurance benefits.

173. Defendant Carroll as IBT CEO wrote a letter to Moore accepting Moore's "verbal resignation."

174. Defendant Carroll, as IBT CEO, wrote a letter to Truitt accepting Truitt's "verbal resignation."

175. Defendant Carroll knew and showed reckless disregard for the failure to pay employee wages while knowing Truitt and Moore were working without getting any pay at all.

176. Defendant Carroll knew IBT failed to pay Moore and Truitt the predetermined salary amounts on a biweekly basis for multiple months.

177. The predetermined salary amounts were not paid due to cash-flow problems at IBT.

178. The reduction of predetermined salary amounts to zero were not based on the quality or quantity of work performed.

179. The reduction of predetermined salary amounts to zero dollars constituted improper deductions.

### Count I: FLSA minimum wage violation

180. At all times material to this action, Defendants were an "employer" of the Plaintiffs as defined by §203(d) of the FLSA.

181. At all times material to this action, Plaintiffs were "employees" of Defendants as defined by §203(e)(1) of the FLSA.

182. Defendants' failure to pay Plaintiffs violated the minimum wage provisions of the FLSA.

183. Defendants failed to record all hours Plaintiffs worked in violation of the FLSA's record keeping requirements.

184. Defendants failed to pay Plaintiffs at least the federal mandated minimum wage for hours worked up to forty hours in a workweek.

185. Plaintiffs are entitled to at least $7.25 per hour for every hour worked up to 40 hours in a workweek.

186. Defendants are liable for unpaid wages and an equal amount as liquidated damages.

187. Defendants intentionally failed and or refused to pay Plaintiffs according to the provisions of the Fair Labor Standards Act.

188. Defendants' actions in failing to compensate Plaintiffs in accordance with the provisions of the FLSA was willful, so a three-year statute limitation should apply to this action.

189. Plaintiff is entitled to unpaid minimum wage for compensable hours up to forty hours a week in those weeks when no salary was paid.

190. Plaintiff is entitled to an amount equal to the unpaid minimum wage for compensable hours up to forty hours a week in those weeks when no salary was paid.

191. Defendants are liable for reasonable attorneys' fees and costs.

### Count II. FLSA overtime compensation violation

192. At all times material to this action, Defendants were an "employer" of the Plaintiffs as defined by §203(d) of the FLSA.

193. At all times material to this action, Plaintiffs were "employees" of Defendants as defined by §203(e)(1) of the FLSA.

194. At all times material to this action, Defendants were, and are, an enterprise engaged in commerce or in the production of goods for commerce as defined §203(s)(1) of the FLSA.

195. Defendants failed to pay Plaintiffs at least "time-and-a-half" the federal mandated minimum wage in excess of forty (40) hours a week.

196. Defendants are liable for unpaid overtime compensation and an equal amount as liquidated damages.

197. Defendants intentionally failed and or refused to pay Plaintiffs according to the provisions of the Fair Labor Standards Act.

198. Defendants' actions and failure to compensate Plaintiffs in accordance with the provisions of the FLSA was willful so that a three-year statute limitation should apply to this action.

199. Plaintiffs are entitled to unpaid overtime compensation for compensable hours over forty hours a week in those weeks when no salary was paid.

200. Plaintiffs are entitled to an amount equal to the unpaid minimum wage for compensable hours over forty hours a week in those weeks when no salary was paid.

201. Defendants are liable for reasonable attorneys' fees and costs.

### Count III. Conversion

202. Defendants committed the intentional tort of conversion.

203. Defendants assumed control over Plaintiffs' salary payments in direct violation of Plaintiff's rights to the money.

204. Defendants assumed control over Plaintiffs' investments of $10,000.00 and have not returned them.

205. Defendant Carroll personally requested Plaintiffs "invest" in IBT knowing that he could not return their money.

206. Defendants used and enjoyed Plaintiffs' money without their consent.

207. Defendants excluded Plaintiffs' rights to their money by holding dominion over the property.

### Count IV. Unjust Enrichment

208. Defendants' actions constitute unjust enrichment.

209. Plaintiffs conferred a benefit on Defendants by performing jobs that included managing customers and employees.

210. Defendants appreciated and accepted the benefits of Plaintiffs' labor.

211. It is unjust and inequitable for Defendants to enjoy the benefit of Plaintiffs' labor without compensating Plaintiffs for their work.

### Count V. Failure to Timely Pay Employees

212. Defendants are required to timely pay Employees pursuant to Tenn. Code Ann. § 50-2-103.

213. Plaintiffs demanded timely payment of rightfully earned compensation on multiple occasions.

214. Defendants did not pay Employees all compensation earned in a timely manner in accordance with the law.

215. Defendants did not pay Employees "all wages or salary earned by the employee no later than the next regular pay day following the date of dismissal or voluntary leaving, or twenty-one (21) days following the date of discharge" following Plaintiffs' termination.

### Count VI. Securities Fraud

216. Defendants sold Plaintiffs' Class B stock at a price of $50.00 per share in blocks of 200 shares.

217. Defendants based their stock offering based on the market value of the company.

218. Defendants represented that the market value of the company was $43,765,404.00.

219. Defendants did not register the securities offered despite not meeting any of the exceptions in Tenn. Code Ann. § 48-1-103.

220. All Employees purchased at least a minimum of 200 shares, with some employees purchasing more.

221. Following the sale of these securities, Defendants provided no further accountings of the investment.

222. Defendants did not return the securities when the Employees left their employ.

223. Defendants have made no offer to sell the securities back or otherwise communicate with the shareholders on the status of their investment.

224. Defendants made this offer of stock knowing that the employees would see no return on their investment.

## VI. PRAYER FOR RELIEF

WHEREFORE, premises considered, the named, Jonathan Moore and Brad Truitt, individually, and on behalf of all other similarly situated persons, pursuant to 29 U.S.C. § 216(b), pray for the following relief:

1. that process issue against Defendants and that the Defendants be required to answer within the time period provided by applicable law;

2. be awarded damages in the amount of their unpaid wages, and an additional equal amount as liquidated damages pursuant to 29 U.S.C. § 216(b), and/or prejudgment interest;

3. lost wages, including back pay, front pay, and an equal amount in liquidated damages;

4. legal or equitable relief as may be appropriate to effectuate the purposes of section 215(a)(3), including without limitation employment, reinstatement, promotion, (front pay

if reinstatement unavailable) and payment of wages lost and additional equal amount as liquidated damages;

5. that Defendants be required to return the full value of any securities purchased;

6. that Defendants be required to pay Plaintiffs' attorneys' fees;

7. that Defendants be required to pay the costs and expenses of this action;

8. that Plaintiffs and all others who join this action be granted such other, further and general relief to which they may show themselves entitled; and,

9. that a jury be impaneled to hear this cause of action at trial

## VII. JURY DEMAND

THE PLAINTIFFS DEMAND A TRIAL BY STRUCK JURY.

/s/ David Weatherman
David Weatherman (TBPR 29446)
**THE WEATHERMAN FIRM**
The Atrium Building
1242 Old Hillsboro Rd.
Franklin, TN 37069
Phone: 615-538-7555
David@TheWeathermanFirm.com

/s/ Daniel E. Arciniegas
Daniel E. Arciniegas (TBPR 35853)
**ARCINIEGAS LAW**
The Atrium Building
1242 Old Hillsboro Rd.
Franklin, TN 37069
Phone: 629-777-5889
Daniel@AttorneyDaniel.com
AttorneyDaniel.com

***Attorneys for Plaintiffs***